UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>HIBEL REALTY, LLC,<br><br><div align="center">Debtor.</div> | Chapter 11<br>Case No. 08-42902 (WCH) |

## MEMORANDUM IN SUPPORT OF EMERGENCY MOTION OF LBM FINANCIAL, LLC FOR RELIEF FROM THE AUTOMATIC STAY OR DISMISSAL OF THE CASE

LBM Financial, LLC ("LBM"), the holder of a first mortgage on the real property located at 337-345 Main Street, Barnstable, Massachusetts (the "Property") which is the sole asset of the Debtor, Hibel Realty, LLC (the "Debtor"), submits this memorandum in support of its motion for relief from the automatic stay or to dismiss this bankruptcy proceeding for cause pursuant to 11 U.S.C. § 1112(b). The Debtor's voluntary Chapter 11 petition (the "Petition") was filed by Bernard J. Laverty, Jr. ("Laverty") who purports to be the manager of the Debtor with authority to initiate this bankruptcy case. However, Laverty (1) is not the manager of the Debtor and has no authority to act on its behalf; (2) is not a member of the Debtor, but merely holds a contingent ownership interest which has not yet vested; and (3) failed to obtain the consent of the actual holder of 100% of the membership interests, Vincent DiMento (who is also the sole manager), to file the Petition in violation of the requirements of the Debtor's Operating Agreement. The Petition was filed in bad faith in a second attempt to hinder and delay LBM's efforts to conduct a foreclosure sale and recover the amounts due under a debt for which Laverty is personally liable. Because the filing was without authority and in bad faith, this bankruptcy proceeding should be dismissed for cause pursuant to 11 U.S.C. § 1112(b). In the event that the Court finds that dismissal is not warranted, LBM has moved in the alternative for relief from the automatic stay

for cause, pursuant to 11 U.S.C. §§ 362(d)(1) and 362(d)(4)(B), to allow it to foreclose its

mortgage on the Property. In further support of the relief sought in this motion, LBM states as

follows:

## I. BACKGROUND

**A.**     **Laverty Lacks Corporate Authority To Sign The Petition As DiMento Is The 100% Owner Of The Debtor And The Sole Member Of The Debtor's Board Of Managers**

1.     The Debtor was organized on or about July 18, 2003, pursuant to an Operating

Agreement ("Operating Agreement"), executed by Robert M. Bradley ("Bradley") and Laverty,

the original members of the Debtor. See the Affidavit of Vincent J. DiMento (hereinafter

"DiMento Affidavit") at ¶ 5 and Exhibit A (Operating Agreement).

2.     Pursuant to the Debtor's Operating Agreement, the business and affairs of the

Debtor were to be managed by the Board of Managers. When the Debtor was formed, Laverty

was the sole member of the Board of Managers. See DiMento Affidavit at ¶ 5 and Ex. A

(Operating Agreement).

3.     On January 20, 2006, Bradley and Laverty transferred their entire membership

interest in the Debtor to Vincent J. DiMento pursuant to a Memorandum of Agreement ("2006

Agreement"). See DiMento Affidavit at ¶ 6 and Ex. B (2006 Agreement).

4.     When they executed the 2006 Agreement, Bradley and Laverty also each

executed a Membership Interest Transfer Instrument, confirming "the sale, assignment and

transfer unto Vincent J. DiMento of all of [their] fifty percent (50%) membership interest in

Hibel Realty LLC … standing in [their] name…." See DiMento Affidavit at Ex. B (Membership

Interest Transfer Instrument).

5.     On March 17, 2006, the Debtor executed and delivered to LBM a promissory note

in the original principal amount of $1,330,000.00 (the "Note"). Also on that date, the Debtor

granted LBM a mortgage on the Property to secure satisfaction of the amounts due under the Note.

6.      On March 16, 2006, a Certificate of Amendment was filed with the Massachusetts Secretary of State's Office ("2006 Certificate of Amendment") to reflect the change in the Debtor's corporate structure achieved through the 2006 Agreement. See DiMento Affidavit at ¶ 8 and Ex. 3 hereto (2006 Certificate of Amendment).

7.      Pursuant to the 2006 Certificate of Amendment, Laverty was removed as the resident agent and manager of the Debtor and DiMento was named the resident agent and manager. Additionally, the Debtor's principal place of business was changed from 314 West Second Street, South Boston, Massachusetts to 7 Faneuil Hall Market Place, Boston, Massachusetts, the place of business of DiMento. See DiMento Affidavit at ¶¶ 7-8 and Ex. 3 hereto.

8.      As a result of the execution of the 2006 Agreement, Bradley and Laverty have no present ownership interest in the Debtor, but instead they each have an unvested future interest in the Debtor ("Unvested Future Interests"). In accordance with the terms of the 2006 Agreement, these interests will vest only upon the satisfaction of two conditions (the "Conditions"): that the Debtor obtain certain construction-related permits and that the loan to LBM be paid in full through a refinance. See DiMento Affidavit at ¶ 9 and Ex. C hereto.

9.      The Conditions have not been met because LBM's debt has not been satisfied. Although the Debtor did refinance the original Note with a second note executed and delivered to LBM, Bradley and Laverty specifically agreed that the transaction would not constitute a refinance under the 2006 Agreement. See Exhibit 1 hereto (Acknowledgement and Consent).

10.    Consequently, because the second note remains outstanding, the Unvested Future Interests of Bradley and Laverty remain wholly unvested.  See id.

11.    At present, Bradley and Laverty are not members of the Debtor and hold no equity, membership or other vested ownership interests in the Debtor.  See DiMento Affidavit at ¶ 10.

12.    At present, DiMento is the sole member, manager, and member of the Board of Managers of the Debtor, as defined in the Operating Agreement.  See DiMento Affidavit at ¶¶ 2, 7.

**B.    LBM Holds A Mortgage On The Debtor's Property As Well As A Security Interest In The 100% Membership Interest Held By DiMento And The Future Unvested Interests Held By Bradley And Laverty**

13.    On February 16, 2007, the Debtor executed and delivered to LBM a second promissory note in the original principal amount of $3,530,000.00 (the "Second Note"), which satisfied the amounts due and owing by the Debtor to LBM under the Note, satisfied other outstanding debt to LBM, and provided additional working capital to the Debtor.

14.    On February 16, 2007, to secure the Debtor's obligations to LBM under the Second Note, the Debtor granted LBM a first mortgage (the "Mortgage") on the Property pursuant to a Mortgage and Security Agreement recorded with the Barnstable County Registry of Deeds in Book 21804, Page 278 and the Barnstable County Registry District of the Land Court as Document No. 1,057,223 as noted on Certificate of Title No. 169924.  See Exhibit 2 hereto (Mortgage and Security Agreement).

15.    Additionally, on February 16, 2007, Bradley, Laverty, and DiMento each executed a Guaranty pursuant to which they guaranteed the full and prompt payment to LBM of all amounts due by the Debtor under the Second Note.

4

16.     To further secure the Debtor's obligations to LBM, on February 16, 2007, Bradley and Laverty each executed a Rights To Unvested Future Membership Interest Pledge Agreement ("Pledge Agreement") pursuant to which they pledged and delivered to LBM the "unvested future rights to equity interests presently owned by Vincent J. DiMento in Hibel Realty, LLC," which they retained under the 2006 Agreement. <u>See</u> Exhibit 3 hereto (Right to Future Unvested Membership Interest Pledge Agreement).

17.     On February 16, 2007, DiMento executed a Pledge of Member Interests ("Member Interest Pledge Agreement"), pursuant to which he pledged and granted a security interest to LBM in one hundred percent (100%) of the issued and outstanding membership interests of the Debtor as security for all of DiMento's obligations under the Guaranty. <u>See</u> Exhibit 4 hereto (Pledge of Membership Interest).

18.     The Second Note matured on February 16, 2008, but the Debtor, DiMento, Bradley, and Laverty failed, refused and neglected to satisfy their obligations to LBM under the Second Note and Guaranty.

19.     As of April 18, 2008, the Debtor owed LBM $3,989,721.83 consisting of principal, interest and fees under the Second Note, plus all interest and fees accruing thereafter, plus attorneys' fees and costs.  LBM has received no payment since that time.

20.     As a result of the Debtor's default under the Second Note, LBM pursued foreclosure of its Mortgage by scheduling a public auction sale of the Property for May 21, 2008. On the date of the scheduled foreclosure sale, Bradley filed an unauthorized bankruptcy petition purportedly on behalf of the Debtor initiating Chapter 11 Case No. 08-13697 (the "First Bankruptcy").

21.     LBM filed a motion to dismiss the First Bankruptcy on July 18, 2008 based upon Bradley's lack of authority to file a bankruptcy petition (or take any other action) on behalf of the Debtor.

22.     On August 8, 2008, the Debtor filed its own motion to dismiss the First Bankruptcy and assented to the relief sought in LBM's motion to dismiss.  The First Bankruptcy was dismissed on August 20, 2008.

23.     During the First Bankruptcy, LBM received permission from the Court to continue the foreclosure sale to September 10, 2008.

24.     In addition to pursuing foreclosure of its mortgage, LBM also pursued Laverty and Bradley for the amounts due under their Guaranties.  On May 29, 2008, LBM obtained a Judgment by Default against Laverty in the amount of $26,861,915.46 from the Middlesex Superior Court, a portion of which represents his personal liability for the full amount due under his guaranty.[1]  See Exhibit 5 hereto (Execution Evidencing the Judgment).

25.     When it learned of Laverty's filing of the petition that initiated this bankruptcy case, LBM continued the foreclosure sale to September 11, 2008.  Subsequently, LBM was granted relief from the automatic stay to continue that sale a second time and the sale is currently scheduled to occur on September 24, 2008.

### C.     Bradley, Without Knowledge And Authority Of The Debtor's Members And Board Of Managers, Appointed Himself Manager and Filed the Bankruptcy Petition

26.     On May 20, 2008, Bradley filed a Certificate of Amendment with the Massachusetts Secretary of State's Office ("2008 Certificate of Amendment") pursuant to which

---

[1] Laverty has filed a motion to vacate this Judgment and that motion (as well as LBM's opposition to that motion) has been argued to the Middlesex Superior Court and remains under advisement.

he unilaterally named himself as the manager of the Debtor and changed the Debtor's principal address to 1287 Old Post Road, Marstons Mills, Massachusetts.  See DiMento Affidavit at Ex. D (2008 Certificate of Amendment).

27.     Bradley had no authority to take this action on behalf of the Debtor.

28.     Pursuant to ¶ 3.1 of the Operating Agreement, only the Board of Managers has "full and complete authority, power and discretion to make any and all decisions … necessary to accomplish the business and objectives of the Company."  See DiMento Affidavit at Ex. A.

29.     Further, pursuant to ¶ 10.5 of the Operating Agreement, there can be no amendments to the Operating Agreement "except by the unanimous written agreement of all of the Members."  Pursuant to ¶ 1.9(d) of the Operating Agreement, "no other document or oral agreement among the Members shall be treated as part of or superseding this [Operating] Agreement unless it expressly so provides, is reduced to writing and has been signed by all of the Members."

30.     The amendments and the filing of the 2008 Certificate of Amendment were not authorized by DiMento, the sole member of the Debtor and the sole member of the Board of Managers.  The Debtor's governing body executed no documents to lawfully authorize any such amendments.  In fact, Bradley failed to give the members and the Board of Managers of the Debtor any notice that he was filing the 2008 Certificate of Amendment, and the members only learned about it after the fact.  See DiMento Affidavit at ¶¶ 13-14.

31.     On May 21, 2008, Bradley signed and filed the Voluntary Petition for Relief pursuant to Chapter 11 of the United States Bankruptcy Code commencing the First Proceeding. He had no authority to do so.

32.    On September 10, 2008, Laverty – on his own and without the benefit of an attorney – filed the voluntary petition that initiated this bankruptcy case.  He too lacked the authority to do so.

33.    Pursuant to ¶ 3.3(j) of the Operating Agreement, only a member of the Board of Managers has the authority to file a voluntary petition in bankruptcy on behalf of the Debtor and only "upon the unanimous vote of all of the Members owning 100% of the Percentage Interests." See DiMento Affidavit at Ex. A.

34.    The Board of Managers did not authorize the filing of the Debtor's Petition, nor has there been a unanimous vote by all of the members of the Debtor to file such a petition.  See DiMento Affidavit at ¶ 15.

35.    Pursuant to ¶ 3.3(h) of the Operating Agreement, only a member of the Board of Managers has the authority to employ legal counsel "to perform services for the Company and to compensate them from Company funds."  See DiMento Affidavit at Ex. A.

**D.      The Debtor's Sole Asset Is The Property**

36.    The Debtor is a single asset real estate entity as that phrase is defined in 11 U.S.C. § 101(51B)).  Its sole asset is the Property.  See Debtor's Voluntary Petition.

37.    There are no monies or other cash flow generated from the Property and no other assets or proceeds to pay for any obligations, including the Chapter 11 administrative costs and the United States Trustee quarterly fees.

## II. ARGUMENT AND AUTHORITIES

**A.      The Bankruptcy Must Be Dismissed For Cause under 11 U.S.C. 1112 (b)**

Upon a finding that cause exists, a bankruptcy court shall dismiss a Chapter 11 proceeding or convert it to a Chapter 7 proceeding, whichever is in the best interests of the debtor's creditors.  See 11 U.S.C. § 1112(b)(1).  Pursuant to 11 U.S.C. § 1112(b) a party in

interest may bring a motion to dismiss a Chapter 11 case. <u>See</u> 11 U.S.C. § 1112(b). A party in

interest under 28 U.S.C. § 1109(b), includes creditors and creditors have standing to bring a

motion to dismiss. 28 U.S.C. § 1109(b); <u>see also</u> <u>In re Abijoe Realty Corp.</u>, 943 F.2d 121, 125

(1st Cir. 1991) (affirming grant of creditor's motion to dismiss chapter 11 case and finding that

the creditor, as a party in interest under § 1109(b), has standing to bring motion to dismiss under

§ 1112(b)); <u>In re Orchard at Hansen Park, LLC</u>, 347 B.R. 822, 823 (Bankr. N.D. Tex. 2006)

(creditor had standing to bring a motion to dismiss unauthorized bankruptcy petition filed by an

individual who was no longer the debtor's manager where the operating agreement required the

consent of all members to authorize filing of a petition).

### 1. The Bankruptcy Case Must Be Dismissed Because Laverty Had No Authority To File It

The Court should dismiss this bankruptcy case because Laverty had no authority to

commence it on behalf of the Debtor. "The decision to initiate a voluntary bankruptcy case on

behalf of a corporation must be made by those persons having the power of managing the

corporation." <u>AMG Res., Inc. v. Indus. Concerns, Inc. (In re Indus. Concerns, Inc.)</u>, 289 B.R.

609, 617 (Bankr. W.D. Pa. 2003) (dismissing chapter 11 petition filed by the corporate president

because the filing of a bankruptcy petition was not an ordinary business affair and had to be first

approved by the board of directors), *citing* <u>Price v. Gurney</u>, 324 U.S. 100, 104 (1945); <u>see also</u> <u>In</u>

<u>re Milestone Educ. Inst.</u>, 167 B.R. 716, 720 (Bankr. D. Mass. 1994) ("the authority to file a

bankruptcy petition depends upon the corporate documents and state law"). The U.S. Supreme

Court has explained that:

> Under the Bankruptcy Act the power of the court to shift the management of
> a corporation from one group to another, to settle intracorporate disputes,
> and to adjust intracorporate claims is strictly limited to those situations
> where a petition has been approved…. But nowhere is there any indication
> that Congress bestowed on the bankruptcy court jurisdiction to determine
> that those who in fact do not have the authority to speak for the corporation

> as a matter of local law are entitled to be given such authority and therefore
> should be empowered to file a petition on behalf of the corporation.

Price, 324 U.S. at 106; see also In re Elgin's Paint & Body Shop, Inc., 249 B.R. 110 (Bankr.

D.S.C. 2000) (dismissing case where corporate president filed bankruptcy petition unilaterally

and without authority).

Vincent DiMento is the sole manager and sole member of the Debtor. See DiMento

Affidavit at ¶¶ 2, 8, 10, 12. Pursuant to the Debtor's Operating Agreement, only the Board of

Managers has authority to act on behalf of the Debtor and DiMento is the sole member of that

board. See DiMento Affidavit at ¶ 5. Also pursuant to the Debtor's Operating Agreement a

unanimous vote of all of the members of the Debtor is required to commence a bankruptcy

petition on the Debtor's behalf. See DiMento Affidavit at ¶ 15. At no time did DiMento, the

sole member of the Debtor, authorize any one to commence a bankruptcy petition on behalf of

the Debtor. As such, Laverty had absolutely no authority to act on behalf of the Debtor or to

commence this proceeding. Thus, this proceeding must be dismissed as a matter of law. See In

re Stavola/Manson Elec. Co., Inc., 94 Bankr. 21, 24 (Bankr. D. Conn. 1988) (dismissing petition

where the debtor's president was not given the authority to file the petition by the corporate

directors).

**2.   Even if Laverty Had Been Authorized to file the Petition, The Debtor's Bankruptcy Petition Must Be Dismissed For Bad Faith Pursuant To 11 U.S.C. §§ 1112(b)**

The facts of this case, including the fact that the Debtor filed the Petition in order to avoid

foreclosure, establish that even if Laverty had authority to act on behalf of the Debtor, the Debtor

exhibited a lack of good faith in filing the petition such that sufficient cause exists to warrant

dismissal of the Debtor's case pursuant to § 1112(b). See In re Bryan, 104 B.R. 554, 557 (Bankr.

D. Mass. 1989) ("Particularly when there is no realistic possibility of an effective reorganization

and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured

creditors to enforce their rights, dismissal of the petition for lack of good faith is appropriate"

*quoting* In re Albany Partners, Ltd., 749 F.2d 670, 674 (11th Cir. 1984); In re G-2 Realty Trust, 6

B.R. 549, 553-54 (Bankr. D. Mass. 1980) (petition was dismissed where the sole purpose of the

filing was a bad faith attempt to prevent or delay secured creditor's imminent foreclosure sale of

substantially all of debtor's property); In re Harvey Road Assoc., VIII, 140 B.R. 302, 305 (Bankr.

D. Mass. 1992) ("lack of a good faith filing is cause for dismissal").

     In re Bryan, the Court looked to, *inter alia*, the following factors, applied by the court

in In re Wentworth, 83 B.R. 705 (Bankr. D.N.D. 1988), to determine whether a lack of good

faith existed to warrant dismissal under § 1112(b):

- "The debtor has few or no unsecured creditors";

- "The pre-petition conduct of the debtor has been improper";

- "There are few debts to non-moving creditors";

- "The petition was filed on the eve of foreclosure";

- "The foreclosed property is the sole or major asset of the debtor";

- "The debtor has no ongoing business or employees";

- "There is no possibility of reorganization;

- "The debtor's income is not sufficient to operate";

- "Reorganization essentially involves the resolution of a two party dispute";

- "The debtor filed solely to create the automatic stay".

In re Bryan, 104 B.R. at 558, *quoting* In re Wentworth, 83 B.R. 705 (Bankr. D.N.D. 1988).

An analysis of these factors warrants a finding of lack of good faith such that the proceeding

must be dismissed.

The Property is the only asset of the Debtor, the Debtor's sole purpose was to develop the Property and the Debtor conducts no other business and has no employees. The Debtor generates no income and will not have any revenue to pay either the administrative expenses or to fund a plan of reorganization absent significant additional financing. Based on an analysis of the factors cited by In re Bryan, 104 B.R. at 558 a finding of lack of good faith is warranted such that the petition should be dismissed. See In re G-2 Realty Trust, 6 B.R. at 554 (granting motion to dismiss where the petition was not filed for any legitimate business purpose or in an attempt to facilitate a reorganization, but was meant to merely prevent foreclosure). Furthermore, Laverty is personally liable to LBM for the debt LBM sought to enforce through the foreclosure. Thus, it is in Laverty's interest to stall any enforcement action by LBM in part through commencing this action.

**B.      In the Alternative, LBM Is Entitled To An Order For Relief From The Automatic Stay For Cause Pursuant To 11 U.S.C. §§362(d)(1) and 362(d)(4)**

If this Court does not dismiss this proceeding, pursuant to 11 U.S.C. § 1112(b), LBM is entitled to relief from the automatic stay for cause and because this is the Debtor's second bankruptcy filing initiated to hinder, delay and defraud LBM. Under 11 U.S.C. § 362(d)(1) a party in interest can be granted relief from the automatic stay if it establishes cause. See 11 U.S.C. § 362(d)(1). Cause pursuant to 11 U.S.C. §362(d)(1) includes a lack of good faith in the Debtor's filing. See In re Laguna Assocs. Ltd. Pshp., 30 F.3d at 738 (stay lifted because debtor's eleventh hour petition on the eve of foreclosure constituted bad faith); In Re Spectee Group, Inc., 185 B.R. 146, 155 (Bankr. S.D.N.Y. 1995) ("Bad faith exists where the debtor lacks any realistic possibility of reorganization and files the petition for the sole purpose of frustrating or delaying its secured creditor's efforts to enforce its legitimate rights"). The factors used to analyze bad faith pursuant to 11 U.S.C. §362(d)(1) are the same as those used to analyze bad faith under 11

U.S.C. §1112(b), although in certain instances relief from stay, as a result of lack of good faith, may be warranted where dismissal is not. See In re Dixie Broadcasting, Inc., 871 F.2d 1023, 1027 (11th Cir. Ala. 1989).

In addition, under 11 U.S.C. § 362(d)(4), a party in interest can be granted relief if the Court finds that the bankruptcy petition was filed to hinder, delay, and defraud a creditor involving multiple bankruptcy filings affecting the same property.

For the reasons cited above, if this proceeding is not dismissed, LBM should be granted relief from stay to pursue its rights under the Mortgage under either or both sections 362(d)(1) and 362(d)(4). It is apparent that the sole reason for the Debtor's second bankruptcy filing was again to hinder and delay the foreclosure of LBM's mortgage. LBM is also the only creditor of the Debtor that has appeared or taken any action in this proceeding. Further, the Debtor has no assets other than the Property which generates no income. The Property is the only asset of the Debtor available to satisfy the Debtor's obligations to LBM and to its other creditors. Because Laverty has filed this action in bad faith and solely to avoid LBM's exercising of its rights and remedies under the Mortgage, LBM should be granted relief from stay.

## III. <u>CONCLUSION</u>

As demonstrated herein, the Debtor had no authority to file its voluntary petition and the petition was filed in bad faith. As such the case should be dismissed for cause pursuant to 11 U.S.C. § 1112(b). Alternatively, LBM requests relief from stay to allow it to exercise any and all of its contractual and state law rights and remedies against the Debtor to foreclose the Mortgage upon the Property and for such other and further relief as this court deems necessary.

WHEREFORE, LBM Financial, LLC, prays that this Court enter an Order:

1.      Dismissing the Chapter 11 case of Hibel Realty, LLC;

2.      In the alternative, enter an order (a) approving this Motion and granting LBM, its

successors and/or assigns, relief from the automatic stay for the purpose of: (i) exercising its

rights under the Mortgage and under applicable state law, including, without limitation, taking

possession of the Property and/or foreclosing or accepting a deed in lieu of foreclosure of the

Mortgage; (ii) preserving its right to seek any deficiency to the extent permitted by state and

federal law; and (iii) serving all appropriate notices in connection with these actions and bringing

such further actions, including, without limitation, summary process proceedings, as are

permissible by law; and (b) waiving the ten day stay imposed by Fed.R.Bankr.P. 4001(a)(3); and

3.      Granting such other and further relief as may be just and proper.

                              Respectfully submitted,

                              LBM FINANCIAL, LLC,


                              /s/  Jeffrey D. Ganz
Dated:  September 16, 2008    Jeffrey D. Ganz (BBO #564375)
                              Riemer & Braunstein LLP
                              Three Center Plaza
                              Boston, Massachusetts 02108
                              (617) 523-9000

# Exhibit 1

## ACKNOWLEDGEMENT AND CONSENT OF UNVESTED
## FUTURE MEMBERSHIP INTEREST HOLDERS

The undersigned Robert M. Bradley and Bernard J. Laverty, Jr., holder of unvested future rights to equity interests presently owned by Vincent J. DiMento ("VJD") in Hibel Realty, LLC, a Massachusetts limited liability company (the "Company") hereby acknowledge and consent to a refinance of the existing debt of the Company with LBM Financial, LLC and an additional sum of $530,000 for the total sum of $3,530,000.00.

The undersigned further acknowledge that such refinance does not qualify for or constitute a refinance for the purpose of VJD's agreement with them, dated January 20, 2006 as a requirement for the vesting of their future interest and therefore such interest has not vested.

Executed this 16th day of February, 2007 as a sealed instrument.

_____
Robert M. Bradley

_____
Bernard J. Laverty, Jr.

# Exhibit 2

Doc:1,057,223 02-26-2007 12:55
BARNSTABLE LAND COURT REGISTRY

Bk 21804 Pg278 #11295

02-26-2007 @ 01:49p

Property Address: 337-345 Main Street, Hyannis, Massachusetts

# MORTGAGE AND SECURITY AGREEMENT

## ARTICLE I

**DEFINITIONS:**

The following expressions shall have the following meanings:

| | |
|---|---|
| **DATE OF MORTGAGE AND SECURITY AGREEMENT:** | February 16, 2007 |
| **MORTGAGOR:** | Hibel Realty LLC<br>a Massachusetts Limited Liability Company<br>with an address of<br>7 Faneuil Hall Marketplace, 3rd Floor<br>Boston, MA 02109 |
| **MORTGAGEE:** | LBM Financial, LLC<br>a Massachusetts Limited Liability Company<br>with an address of 171 Locke Drive, Suite 114<br>Marlborough, MA 01752 |
| **THE MORTGAGE AMOUNT:** | $3,530,000.00 |
| **THE NOTE:** | A promissory note of even date herewith given by Mortgagor to the order of Lender in the Mortgage Amount, payable together with interest as therein stated. |
| **THE TERM:** | One (1) Year. |
| **THE LAND:** | **337-345 Main Street, Hyannis, Barnstable County, Massachusetts**, described in Exhibit A attached hereto, including all easements, rights, privileges and appurtenances thereto belonging or pertaining, and |

PLEASE RECORD AND RETURN TO:
Michael J. Norris, Esq.
171 Locke Drive, Suite 101
Marlborough, MA 01752

19

all of the right, title and interest of Mortgagor
therein and in the streets and ways adjacent thereto,
present or contingent, now existing or hereafter
acquired.

**THE IMPROVEMENTS:**   The buildings and other structures and other
improvements now or hereafter upon the Land,
including all machinery, fixtures and equipment of
every kind and nature whatsoever forming a part
of said buildings or other structures, including, but
without limitation, portable or sectional buildings,
electric equipment, gas equipment, plumbing equipment,
heating, air conditioning and ventilating equipment,
elevators and escalators, awnings, screens, storm doors,
storm windows, blinds, shades, cabinets, stoves, disposals
refrigerators, dishwashers, floor coverings, lobby
furnishings, sprinkler equipment, incinerating equipment,
fire alarm systems and swimming pool and other
recreational equipment, trees, hardy shrubs and perennial
flowers, and also including all materials stored on the
Land for incorporation into the Improvements.

**THE CHATTELS:**   All machinery, fixtures and equipment and other articles
of personal property now or at any time hereafter attached
to, placed upon, or used in any way in connection with the
use, enjoyment, occupancy, or operation of the
Improvements, excluding, however, personal property
of occupants of space within the Improvements which
personal property said occupants shall have the right to
remove by the provisions of their tenancy arrangements.

**THE MORTGAGED
PROPERTY:**

    (i)    The Land;

    (ii)    The Improvements;

    (iii)    The Chattels;

    (iv)    all proceeds of the conversion,
voluntary or involuntary, of any of
the foregoing into cash or liquidated
claims including, but without
limitation, proceeds of insurance
provided for in Section 4.4 below and
proceeds of condemnation awards and
awards for restriction of access to, or
change of grade of streets;  and

> (v)     all right, title and interest of Mortgagor in all leases, or other tenancy arrangements, now or hereafter existing, of the whole or parts of the Land and Improvements, including security deposits thereunder, in the rents payable thereunder, in all agreements, licenses and permits affecting the Land, Improvements and Chattels, and in all other rents, issues and profits of the Land, Improvements and Chattels.

| | |
|---|---|
| **ESTATE OF BORROWER IN THE LAND** | Fee Simple |
| **THE USE:** | Commercial |
| **THE LOAN DOCUMENTS:** | The Note, this Mortgage and Security Agreement (hereinafter called "Mortgage"), Guaranties, and Commitment Letter given by Mortgagor in connection with the Security Agreement hereby created and all other instruments given by Mortgagor to Lender now or hereafter as security for the Note or in connection with the indebtedness evidenced thereby. |

## ARTICLE II

### CONCURRENT MATTERS:

   **2.1**    Concurrently with the execution and delivery hereof Mortgagor has executed and delivered to Lender the Note.  Mortgagor has also delivered to Lender certain Guaranties.

## ARTICLE III

### GRANTING CLAUSE:

   **3.1**    For consideration paid Mortgagor grants the Mortgaged Property unto Lender, with Mortgagor Covenants to secure (i) the payment of the Mortgage Amount, together with interest thereon as provided in the Note, (ii) the performance and observance of all obligations and representations (hereinafter collectively called "obligations") of Mortgagor under this Mortgage and under the Note and under all other documents given to secure the Note, and (iii) the payment of all other indebtedness, from time to time, of Mortgagor to Lender.

**3.2**    Lender and its successors and assigns and any of them, as the context admits, are herein called "Holder". The expression "Mortgagor" as used herein, shall mean the Mortgagor named herein and all successors to the interest of Mortgagor named herein and each of them, except only as expressly otherwise provided herein; but Holder shall not be required at any time to recognize as Mortgagor any person unless and until Holder shall receive evidence satisfactory to it that such person hold Mortgagor's interest.

## ARTICLE IV

## REPRESENTATIONS, AGREEMENTS AND CONDITIONS:

**4.1**    Mortgagor will pay all sums secured hereby promptly as and when the same become due and payable.

**4.2**    Mortgagor lawfully holds its estate in the Mortgaged Property set forth in Article I, free from encumbrances, except those encumbrances set forth in Schedule A, or set forth in the title insurance policy delivered to Lender in connection herewith, and has good right and power to transfer the Mortgaged Property to Holder for the uses and purposes in this Mortgage set forth; and Mortgagor shall and will warrant and defend its said title to Holder forever against the claims and demands of all persons whatsoever.

**4.3    (a)**    Mortgagor will pay, at least ten (10) days prior to the last day when the same shall be payable without interest or late charge (and will provide by such time evidence of such payment satisfactory to Holder), all taxes, assessments and governmental charges of every type or nature, to whomever assessed, imposed upon or against the Mortgaged Property or any part thereof, or upon the rents, issues and profits therefrom or upon the lien or estate created hereby, or arising in respect of the occupancy, use or possession of the Mortgaged Property including, without limitation, real and personal property taxes, taxes on rents, betterment assessments, permit and license fees, and water and sewer charges. Nothing in this subsection shall extend to any income tax or corporation excise tax of Holder.

**(b)**    Holder may, at its election, require the deposit by Mortgagor at the time of each payment of an installment of interest or principal under the Note, of an additional amount sufficient to discharge the obligations under subsection (a) above when they become due. The determination and redetermination, from time to time, of the amounts so to be deposited with Holder, so that the aggregate of such amounts shall be sufficient for this purpose, shall be made by Holder in its sole discretion. No trust shall be created by such deposits and the amounts so deposited may be commingled with other funds of Holder and shall be held by Holder without interest and applied to the payment of the obligations in respect to which such amounts were deposited or, at the option of Holder, to the payment of said obligations in such order of priority as Holder shall determine, on or before the respective dates on which the same or any of them would become delinquent, or, to the extent permitted by law, to the payment of any other obligation secured by this Mortgage. If one (1) month prior to the due date of any of the aforementioned obligations the amounts then on deposit therefor shall be insufficient for the payment of such obligation in full, Mortgagor, within ten (10) days after demand, shall deposit the amount of the deficiency with Holder. Nothing herein contained shall be deemed to affect any right or remedy of Holder under Article VII.

(c)    Mortgagor will not permit to exist any mechanics', materialmen's or laborers' liens upon the Mortgaged Property or any part thereof.  None of the Chattels will be subject to any conditional sales agreement, Chattel mortgage, lease or use agreement or other security interest except only the security interest of Holder therein.

(d)    Mortgagor will keep the Mortgaged Property free of any claims, lien or encumbrance which may be or become prior to this Mortgage.

(e)    Nothing in this Section 4.3 shall require the payment or discharge of any obligation imposed upon Mortgagor by this Section so long as Mortgagor shall, in good faith and at its own expense, contest the same, or the validity thereof, by appropriate legal proceedings which shall operate to prevent the collection thereof, or other realization thereupon or the sale of forfeiture of the Mortgaged Property, or any part thereof, to satisfy the same;  provided that Mortgagor shall give notice to Holder of such contest prior to such contest and at all times during such contest Mortgagor shall at the option of Holder, provide security satisfactory to Holder, assuring the discharge of Mortgagor's obligation hereunder and of any additional charge, penalty or expense arising from or incurred as a result of such contest.

4.4    (a)    Mortgagor will keep the Improvements and Chattels insured against loss by fire, the perils against which insurance is afforded by the Extended Coverage endorsement, vandalism and malicious mischief, and such other risks and perils as may be specified by Holder, including without limitation, rent insurance and flood insurance.  Mortgagor shall deliver policies of such insurance to Holder forthwith, and a renewal of each expiring policy at least fifteen (15) days prior to the expiration date.  Such insurance shall be written in forms, amounts and by companies satisfactory to Holder, and losses thereunder shall be payable to Holder pursuant to a loss-payable-to-mortgagee clause standard in the State in which the land lies.  Such insurance shall provide that the same shall not be canceled as to Holder, unless Holder shall receive notice of such cancellation at least twenty (20) days prior to the date designated in said notice as the cancellation date.  Such insurance shall provide that any waiver in writing by the insured prior to loss of any or all rights of recovery against any party for loss shall not affect the validity of the insurance or the right of recovery thereunder. Such insurance shall provide that the same shall be payable to Holder notwithstanding any defense the insurer may have to the payment of the same to Mortgagor or to any person holding any other interest in the Mortgaged Property. Also, if the insurer shall have had a defense to the payment of any insurance proceeds to Mortgagor, but shall have paid the same to Holder, any interest the insurer shall have in the Mortgaged Property as security for the repayment of said proceeds shall be fully subordinated to the interest of Holder in the Mortgaged Property.  Mortgagor shall not maintain any insurance upon the Mortgaged Property against fire or other casualty unless the loss thereunder shall be payable to Holder in the manner aforesaid.  Upon foreclosures of this Mortgage, any prepaid insurance then outstanding shall become the absolute property of Holder.  Mortgage authorizes Holder, at its option, to adjust and compromise any losses under such insurance for an on behalf of Mortgagor, and any such adjustment and compromise shall be binding on Mortgagor.

(b)    Mortgagor shall give Holder prompt notice of any damage to the Mortgaged Property by fire or other casualty.

(c)    Mortgagor will also cause appropriate public liability insurance to be maintained in such amounts as Holder shall request and shall deliver to Holder evidence of such insurance.

4.5    Mortgagor will maintain the Mortgaged Property in good order, condition, and repair, damage from casualty expressly not excepted, promptly replacing any items of the Mortgaged Property which may become lost, destroyed or unsuitable for use with other property of similar character. Mortgagor will not permit or commit any waste of the Mortgaged Property, will comply with all laws, ordinances, regulations, agreements, conditions and restrictions affecting the Mortgaged Property and will not permit any violation thereof. Mortgagor will not permit any condition to exist which would wholly or partially invalidate any insurance upon the Mortgaged Property or create any extra premiums therefor. Mortgagor will not permit any buildings to be removed or altered, or any additions to be made to any existing buildings or any new buildings to be erected unless Holder shall first consent thereto in writing. Mortgagor shall maintain and preserve parking areas, driveways and other public areas upon the Mortgaged Property as shown on final plans approved by Holder, and, without the prior written consent of Holder, no new buildings, or other structures shall be erected on said parking areas, driveways or other public areas and no new buildings or additions to existing buildings shall be erected on the Mortgaged Property. For the purposes hereof, the restoration of buildings damaged by fire or other casualty (including taking by eminent domain) shall not be deemed to be an erection of a new building or an addition to an existing building. For the purposes hereof, the restoration of buildings damaged by fire or other casualty (including taking by eminent domain) shall not be deemed to be an erection of a new building or an addition to an existing building.

4.6    (a)    Mortgagor shall operate the Land and Improvements for the Use set forth in Article I. If, at any time, the then existing use or occupancy of the Mortgaged Property, or any part thereof, shall, pursuant to any applicable zoning or other law, ordinance or regulation, be permitted only so long as such use or occupancy shall continue, Mortgagor shall not cause or permit such use or occupancy to be discontinued without the prior written consent of Holder.

(b)    Mortgagor shall cause the Land and Improvements to be operated in compliance with all restrictions, encumbrances or agreements affecting said land and Improvements and with all zoning and building codes and other applicable laws, ordinances, rules and regulations of all public authorities having jurisdiction.

4.7    Mortgagor will perform and observe all obligations of Mortgagor under all leases or other tenancy arrangements or other agreements, licenses or permits from time to time affecting the Mortgaged Property or any part thereof. Mortgagor shall use reasonable diligence to enforce the obligations of the other parties to said leases and other agreements. Mortgagor will not accept any rents for any period more than one (1) month in advance.

4.8    (a)    Mortgagor shall maintain full and correct books and records showing in detail the earnings and expenses of the Mortgaged Property and will permit Holder and its representatives to examine said books and records, and all supporting vouchers and data, at any time and from time to time upon request by Holder.

**(b)**    Mortgagor and each Guarantor shall deliver to Holder within ninety (90) days after the close of each fiscal year of Mortgagor a balance sheet and a statement of profit and loss with respect to the Mortgaged Property, prepared in accordance with generally accepted accounting principles and certified by a certified public accountant acceptable to Holder.  Said statement of profit and loss shall include an itemized statement of income and expenses with respect to the Mortgaged Property, plus an itemized statement of the gross sales of each occupant of the Mortgaged Property whose rent is based, in whole or in part, upon a percentage of its gross sales.  Each Guarantor shall deliver annually a signed Federal and State Tax Return and a personal Financial Statement.

**4.9    (a)**    Mortgagor will, at its own cost, execute and deliver such further instruments and do such further acts as Holder shall, from time to time, require to correct any defect, error or omission herein or better to assure to Holder the property and rights transferred to Holder hereunder, in particular, and without limitation:

**1.**    To carry out the transfer to Holder, as security, of so much of the Mortgaged Property as is described in subdivision (iv) under the definition of Mortgaged Property, Mortgagor appoints, Holder its attorney-in-fact to collect and receive any such proceeds from the authorities or entities paying the same, to appear in any proceeding therefor, and to give receipts and acquittances therefor; and Mortgagor will execute and deliver to Holder, on demand, such assignments and other instruments as Holder may require for said purposes and will reimburse Holder for its costs (including reasonable counsel fees) in the collection of such proceeds.

**2.**    To carry out the transfer to Holder, as security, of so much of the Mortgaged Property as is described in subdivision (v) under the definition of Mortgaged Property. Mortgagor agrees (a) to execute and deliver to Holder such conditional assignments of leases and other tenancy arrangements of portions of the Mortgaged Property and rents payable thereunder as Holder may, from time to time, request, and (b) not to cancel, accept a surrender of, reduce the rentals under, anticipate any rentals under, or modify any such leases or other tenancy arrangements or consent to any assignment or subletting thereof, in whole or in part, without Holder's written consent.  Nothing herein shall obligate Holder to perform the obligations of Landlord under any of such leases or other tenancy arrangements, which obligations Mortgagor shall perform.  Holder shall have the right, by the execution of suitable written instruments, from time to time, to subordinate this Mortgage and the rights of Holder to any lease or leases from time to time in force with reference to the Mortgaged Property, and, on the execution of any such instrument, this Mortgage shall be subordinate to the lease for which such subordination is applicable with the same force and effect as if such lease had been executed and delivered prior to the execution, delivery and recording of this Mortgage.

**(b)**    Mortgagor will cause this Mortgage and all instruments of further assurance and all financing and continuation statements required by the applicable provisions of the Uniform Commercial Code at all times to be kept, recorded and filed in such places as in the opinion of Holder's counsel may be required to preserve and protect fully the rights of Holder.  In addition to paying all fees and expenses in connection with the foregoing, Mortgagor will pay all stamp taxes and other taxes and charges in connection with the Note, the Mortgage, the Uniform Commercial Code Financing Statements and all instruments of further assurance.  Holder may, at its election, accomplish such recordings and filing and such payments of such taxes and charges for the account of Mortgagor, and, in such event, Mortgagor shall reimburse Holder, from time to time, within ten (10) days after demand is made therefor, for the costs and expenses of Holder in so doing.

**4.10**    Any transfer, mortgage or pledge of the interest or any part of the interest, in the Mortgaged Property of Mortgagor or any Guarantor of the obligations of Mortgagor without the written consent of Holder, voluntarily or involuntarily, or by operation of law, shall be a default under this Mortgage. Any consent to any one transfer, mortgage or pledge shall be deemed a consent only to said one (1) transfer mortgage or pledge and shall not be a waiver of the requirement of consent to any further transfer, mortgage or pledge.

        If Mortgagor's rights become vested in a person other than Mortgagor named herein, Holder may, without notice to Mortgagor named herein, deal with person to extend or modify this Mortgage or the payments hereunder or the indebtedness secured hereby, or release part of the Mortgaged Property without releasing or diminishing the liability or obligation of Mortgagor named herein.

**4.11**    Holder shall have the right to enter upon and inspect all parts of the Mortgaged Property at all reasonable times.

**4.12**    In the event the Mortgaged Property or any part thereof shall be taken by right of eminent domain, or access or any street shall be restricted, or the grade of any street shall be changed; awards of damages therefor shall be paid to Holder. Such awards shall, at the election of Holder, be used in any one or more of the following ways: (1) applied to the indebtedness secured hereby, matured or unmatured, (2) used to perform any obligation of Mortgagor hereunder as Holder may determine, (3) used to repair or restore the Mortgaged Property as Holder may require or (4) released to Mortgagor.

**4.13**    So long as Mortgagor is not in default under this Mortgage, the Note or any other obligation of Mortgagor to Holder, rents payable by occupants of portions of the Land and Improvements shall be payable to Mortgagor, but upon notice by Holder to any such occupant that Mortgagor is in default, rents payable by such occupant shall become payable to Holder without any obligation on the part of any such occupant to inquire whether default has, in fact, occurred. Holder shall have the right to apply rents received to the indebtedness secured hereby, matured or unmatured. Holder may demand, sue for and recover such rents, but shall not be obligated to do so. Nothing herein shall be construed as an approval by Holder of any lease, other tenancy arrangement, agreement, license or permit, and nothing herein shall obligate Holder to perform any obligations of Mortgagor under any of said leases, other tenancy arrangements, agreements, licenses or permits, which obligations Mortgagor agrees to perform punctually.

**4.14**    Receipt of any insurance proceeds, condemnation awards, rents or other moneys or evidences thereof, as aforesaid and any disposition thereof by Holder shall not constitute a waiver of any rights of Holder, statutory or otherwise, and specifically shall not constitute a waiver of the right of foreclosure by Holder in the event of any failure of performance of any obligation of Mortgagor hereunder, or under the note, or other evidence of indebtedness given by Mortgagor to Holder

**4.15**    If this Mortgage, by its terms, is now, or at any time, subject or subordinate to a prior mortgage, Mortgagor shall not, without the consent of Holder agree to the modification, amendment, or extension of such prior mortgage, and Mortgagor will perform all obligations of Mortgagor under such Mortgage.

**4.16**   Mortgagor agrees to pay, when due, all fees and expenses incurred incident to the loan transaction evidenced by the Note and secured by this Mortgage, the assurance of the security represented by this Mortgage, and incident to the enforcement of the Note and this Mortgage, including, without limitation, reasonable attorneys' fees and expenses and brokers' commissions, if any.

**4.17**   If Holder shall be made party to any action by reason of the execution of this Mortgage or the Note, or in which the priority of the lien of this Mortgage shall be challenged, Mortgagor shall reimburse to Holder, immediately upon demand, all sums of money paid by Holder to defend said action and uphold the lien created hereby.

**4.18**   If the United States, or any department or bureau thereof, shall determine that this Mortgage or the Note is subject to tax or duty arising under the Interest Equalization Tax Act, Mortgagor will promptly pay, upon demand, such tax or duty.

**4.19**   If Mortgagor shall be the Trustees of a Trust, the Trustees hereby certify, pursuant to the provisions of said Trust, that said Trust is in full force and effect, that said Trust has not been amended and that they are the sole Trustees of said Trust.

**4.20**   Mortgagor is duly authorized to carry on its business as presently conducted and to make and enter into the Loan Documents and to carry out the transactions contemplated therein.  The Loan Documents have each been duly executed and delivered by Mortgagor, and each is a legal, valid and binding obligation of Mortgagor, enforceable in accordance with its terms.

**4.21**   Mortgagor is not now in default under any instruments or obligations relating to the Mortgaged Property and no party has asserted any claims of default relating to the Mortgaged Property. The execution and performance of the Loan Documents and the consummation of the transactions thereby contemplated will not result in any breach of, or constitute a default under, any contract, mortgage, lease, bank loan or credit agreement, trust indenture, or other instrument to which Mortgagor is a party or by which Mortgagor may be bound or affected and do not violate or contravene any law, order, decree, rule or regulation to which Mortgagor is subject; nor do any such instruments impose or contemplate any obligations which are or will be inconsistent with any other obligations imposed on Mortgagor under any other instruments heretofore or hereafter delivered by Mortgagor.

**4.22**   The Improvements have been completed or will be installed in a good and workmanlike manner, in accordance with all applicable governmental laws, regulations and requirements. The Improvements are served or will be served by electric, gas, sewer, water and other utilities required for the use and operation thereof. Any and all streets and other off-site improvements necessary for the use and operation of the Mortgaged Property have been completed, are serviceable, and have been accepted by applicable governmental bodies. The Mortgaged Property complies with all applicable federal, regional, state and local laws, ordinances, regulations, requirements and the like.

**4.23**   There are no actions, suits or proceedings including, without limitation, condemnation, insolvency and bankruptcy proceedings, pending or threatened, against or affecting Mortgagor or the Mortgaged Property, or which may involve or affect the validity or enforceability of the Loan Documents at law or in equity, or before or by any governmental authority, except actions, suits and proceedings fully covered by insurance.  Mortgagor is not in default with respect to any order, writ,

injunction, decree or demand of any court or any governmental authority affecting Mortgagor or the Mortgaged Property.

**4.24**    All statements, financial or otherwise, submitted to Lender in connection with this transaction are true and correct in all material respects, and with respect to the financial statements have been prepared in accordance with generally accepted accounting principles consistently applied and fairly present the financial condition of the parties or entities covered by such statements as of the date thereof, and no additional borrowings have been made by such parties or entities, or any of the, since the date thereof, nor have Mortgagor or the Mortgaged Property experienced a material adverse change since the date hereof.  Mortgagor is now in a solvent condition.

**4.25**    If the laws now in force for the taxation of mortgages or of debts secured by mortgages (including, without limitation, laws exempting from taxation amounts invested in mortgages) shall be changes to the detriment of Holder, then Holder may, at its election accelerate the maturity of the Note, and upon the exercise of such election the maturity will be accelerated, unless within ninety (90) days after Mortgagor shall receive notice of acceleration of the maturity for said reason, Mortgagor, if permitted by law, shall pay the additional tax for which Holder shall have become liable.

<div align="center">

**ARTICLE V**

</div>

**PERSONAL PROPERTY SECURITY AGREEMENT**:

**5.1**    Mortgagor agrees that this Mortgage shall constitute a security agreement with respect to the Chattels and other personal property that is a part of the Mortgaged Property and Mortgagor does hereby convey to Holder a security interest therein.  Holder shall have all of the remedies of a secured party under the Uniform Commercial Code as now in effect in the State in which the Land lies and such further remedies as may, from time to time, hereafter be provided in said State for a secured party with respect to both said personal property security and any personal property security that may hereafter be given as further security for the indebtedness secured by this Mortgage; provided, however, that nothing herein shall preclude Holder from proceeding both as to personal property security and real estate security in accordance with Holder's rights and remedies with respect to real estate security.

<div align="center">

**ARTICLE VI**

</div>

**MISCELLANEOUS**:

**6.1**    Without affecting the liability of Mortgagor or any other person obligated therefor (except any person expressly released in writing) for the payment of any indebtedness secured hereby or for performance of any obligation contained herein, and without affecting the rights of Holder with respect to any security not expressly released in writing, Holder may, at any time and from time to time, either before or after the maturity of the Note and without notice or consent:

       **(a)**    Release any person liable for the payment of all or any part of the indebtedness or for the performance of any obligation.

    **(b)**   Make any agreement extending the time, or otherwise altering the terms of payment of, all or any part of the indebtedness or modifying or waiving any obligation, or subordinating, modifying or otherwise dealing with the lien or charge hereof.

    **(c)**   Exercise, refrain from exercising or waive any right Holder may have.

    **(d)**   Accept additional security of any kind.

    **(e)**   Release or otherwise deal with any property, real or personal, securing the indebtedness, including all or any part of the Mortgaged Property.

    **6.2**   No consent or waiver by Holder to or of any default by Mortgagor shall be construed as a consent or waiver to or of any further default in the same or any other term, condition, covenant or provision of this Mortgage or of the obligations secured hereby.

    **6.3**   Any agreement hereafter made by Holder with Mortgagor pursuant to this Mortgage shall be superior to the rights of the Holder of any intervening lien or encumbrance.

    **6.4**   No delay by Holder in exercising any right or remedy hereunder, or otherwise afforded by law, shall operate as a waiver thereof or preclude the exercise thereof during the continuance of any default hereunder.

    **6.5**   Any notice shall be deemed duly given by any sender to an addressee (i) if delivered personally to said addressee against a receipt thereof signed by said addressee by registered or certified mail, postage prepaid, return receipt requested, at the "Notice Address" of said addressee. The time of the giving of any notice shall be the time of receipt thereof by the addressee or an agent of the addressee, except that in the event the notice mailed as above provided shall not be received upon delivery thereof to the Notice Address because of a refusal of receipt, the absence of a person to receive or otherwise, the time of the giving of such notice shall be the time of such delivery. The Notice Address of Holder shall be as set forth in Article I and the Notice Address of Mortgagor shall be as set forth in Article I, but, if the sender of any notice to any addressee shall have previously been given notice by said addressee of a change of address of said addressee, such changed address shall thereafter as to such sender be deemed the Notice Address of such addressee.

    **6.6**   If any one or more of the provisions contained in this Mortgage, or in the Note, or in any other document between Holder and Mortgagor relating to the indebtedness secured hereby shall, for any reason, be held to be invalid or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision of this Mortgage; but this Mortgage shall be construed as if such invalid or unenforceable provision did not exist. Also, if any provision shall be held "usurious" under applicable law, the rate of interest provided shall be eliminated.

    **6.7**   If more than one person shall be named in this Mortgage as Mortgagor, the liability of said persons shall be joint and several. The representations and agreements made by any party hereto shall be binding upon said party and his heirs, executors, administrators, successors and assigns; and the representations and agreements made to any party, the conditions for the benefit of said party and the rights and remedies of said party shall inure to the benefit of the heirs, executors, administrators,

successors and assigns of said party.  Wherever used, the singular number shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders.

## ARTICLE VII

**DEFAULT**:

**7.1**    If Mortgagor shall fail to perform any obligation of Mortgagor hereunder, including, without limitation, any obligation under Sections 4.2, 4.3, 4.4, 4.5 or 4.7, then Holder may, at its election, perform such obligation for the account of Mortgagor with right of subrogation thereunder.  In connection therewith, Holder may advance such sums of money as Holder shall deem advisable, without responsibility with respect to the legality, validity or priority of any claim, lien or tax or the amount necessary to be paid to satisfy the same.  Holder shall be subrogated, for further security, to the lien, although released of record, of any lien discharged by a payment by Holder.  Mortgagor shall pay to Holder, immediately upon demand, all sums of money advanced by Holder pursuant to this Section, together with interest from the date of payment at the highest rate of interest provided in the Note, and all such advances plus interest shall be secured hereby.  No such advance shall be deemed to relieve Mortgagor from any default hereunder, or impair any right or remedy of Holder in the event of default of Mortgagor.

    **(a)**    The Borrower shall have fifteen (15) days after notice to cure any default under the terms of this Mortgage unless otherwise provided herein.

    **7.2**    The following shall be Events of Default hereunder:

    **(a)**    A default in the payment, when due, of any indebtedness secured hereby, subject to any applicable grace period.

    **(b)**    A default in the performance of any of Mortgagor's obligations under this Mortgage, the Note or any other instrument given as security for, or in connection with, said indebtedness, the terms of the Commitment Letter, or Assignment of Rents and Leases, or any event stated herein to be a default under this Mortgage.

    **(c)**    If Mortgagor or any Guarantor of the obligations of Mortgagor shall file a petition in bankruptcy or for reorganization, arrangement, composition, readjustment, liquidation, dissolution of other relief of the same or different kind under the provisions of the Bankruptcy Act, or if such a petition shall be filed against Mortgagor or said Guarantor and shall not be dismissed within sixty (60) days after such filing.

    **(d)**    If Mortgagor or any Guarantor of the obligations of Mortgagor is adjudicated a bankrupt or insolvent or makes an assignment for the benefit of creditors, or if any petition or other proceeding is filed by Mortgagor or said Guarantor for appointment of a trustee, receiver, guardian, conservator or liquidator of all, or substantially all, of Mortgagor's or said Guarantor's property, or if such a petition or other proceeding shall be filed against Mortgagor or said Guarantor and shall not be dismissed within sixty (60) days after such filing.

(e)    Any representation or warranty made by Mortgagor herein or in any of the Loan Documents which shall be misleading, untrue or unfulfilled in any material respect.

7.3    So long as any Event of Default shall exist, and following the expiration of all applicable grace periods, then Holder, in addition to, and not in limitation of, any and all other rights or remedies available to it by law or by any other provision of any of the instruments given to secure the Note, shall have the right, without notice:

(a)    To enter upon and take possession of the Mortgaged Property or any part thereof, and to perform any acts Holder shall deem necessary or proper to conserve the Mortgaged Property (including, without limitation, the making of repairs, replacements and alterations), to manage and operate the Mortgaged Property, to collect and receive all rents, issues and profits from the Mortgaged Property, past due and thereafter accruing, and to exercise all other rights of Mortgagor with respect to the Mortgaged Property.

(b)    To have a receiver appointed to enter and take possession of the Mortgaged Property or any part thereof and to perform any acts said receiver shall deem necessary or proper to conserve the Mortgaged Property, (including, without limitation, the making of repairs, replacements and alterations), to manage and operate the Mortgaged Property, to collect and receive all rents, issues and profits from the Mortgaged Property, past due and thereafter accruing, and to exercise all other rights of Mortgagor with respect to the Mortgaged Property.

(c)    To accelerate the maturity of the indebtedness secured by this Mortgage.

(d)    To sell the Mortgaged Property at public auction on or near the Land and upon such terms and conditions as Holder shall determine, having first given such notice, prior to the sale, of the time and place of sale and terms and conditions of sale by publication in one or more newspapers having a general circulation in the municipality in which the Land is located, all subject, however, to the requirements of this Mortgage and applicable law; or to foreclose this Mortgage in any other manner permitted by law.

(e)    To obtain judgment and execution for the indebtedness secured by this Mortgage, to the extent not otherwise satisfied.

7.4    (a)    If Holder shall exercise the right described in either subdivision (a) or subdivision (b) of Section 7.3, the expenses (including, without limitation, reasonable receiver's fees and reasonable counsel fees) incurred pursuant to the powers herein contained shall be secured hereby. Holder shall apply such rents, issues and profits as shall be received by it first to the payment of all costs and expenses incurred and thereafter to the indebtedness secured hereby in such order of priority as Holder, in its sole discretion, shall determine; and the exercise of such rights and disposition of such funds shall not constitute a waiver of any foreclosure, once commenced, nor preclude the later commencement of foreclosure for breach hereof.

(b)    Mortgagor agrees that all rights of Holder as to personal property security and real estate security may be exercised together or separately and further agrees that, in exercising its power of sale, Holder may sell the personal property security or any part thereof either separately from, or together with, the real estate security or any part thereof, in such order as Holder may, in its

discretion, elect, and whether or not the aggregate proceeds thereof exceed the indebtedness secured by this Mortgage. At any sale any combination of or all of the security may be offered for sale for one (1) total price and the proceeds of such sale accounted for in one (1) account without distinguishing between the items of security or assigning to the separate securities proportion of the proceeds; and, in case Holder, in the exercise of the power of sale herein given, elects to sell in parts or parcels, said sales may be held from time to time and the power shall not be fully executed until all of the personal property security and real estate security not previously sold shall have been sold.

(c)    If Holder shall exercise the right described in subdivision (d) of Section 7.3, Holder may adjourn, from time to time, any sale by announcement of such adjournment at the time and place appointed for such sale or such adjourned sale; and, except as otherwise provided by law, Holder may, without further notice or publication, make such sale at the time and place to which the same shall be so adjourned. Upon completion of any sale, Holder shall execute and deliver an instrument conveying, assigning and transferring all right, title and interest in the property and rights sold, in the name of Holder, or in the name of Mortgagor, and the same shall operate to divest all right, title and interest of Mortgagor in any property or right so sold and shall be a perpetual bar, both at law and in equity, against Mortgagor and all persons claiming under Mortgagor.

(d)    The rights and remedies of Holder for any default under any of the instruments given as security for, or in connection with, the indebtedness secured hereby are not mutually exclusive, and may be exercised successively or concurrently and from time to time for as long as any default exists. The failure of Holder to exercise any such rights in any one (1) or more instances, or the acceptance by Holder of partial payments of amounts in default secured hereby, shall not constitute a waiver of such default, but such right shall remain continuously in force. Acceleration of maturity, once claimed hereby by Holder, may, at its option, be rescinded by written acknowledgment to that effect without waiving the default or any rights, including the right to accelerate again, with respect thereto. The tender and acceptance of partial payment of amounts in default after acceleration, or in commencement of any foreclosure action, shall not in any way affect, rescind or terminate such acceleration of maturity or such foreclosure action.

7.5    In case redemption is had by Mortgagor after foreclosure proceedings have begun, Holder shall be entitled to collect all costs, charges and expenses incurred upon to the time of redemption; and, in case of foreclosure sale, Holder shall be entitled to retain one percent (1%) of the purchase money in addition to the costs, charges and expenses allowed by law. If the debt secured hereby shall not be paid when due, Holder may require thirty (30) days' notice in writing before payment unless foreclosure proceedings have been begun.

7.6    This Mortgage is upon the Statutory Condition and upon the further condition that all obligations of Mortgagor herein shall be kept and fully and seasonably performed. For any breach of any of said conditions Holder shall have the Statutory Power of Sale in addition to any other remedies for breach herein contained or by law permitted.

**IN WITNESS WHEREOF**, Mortgagor has executed this Mortgage under seal as to the day and year first above written.

WITNESS:                                    Hibel Realty LLC

_____                     By: _____
                                            Vincent J. DiMento, Manager

## COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss

On this 16th day of February, 2007, before me, the undersigned notary public, personally appeared Vincent J. DiMento, proved to me through satisfactory evidence of identification, being a driver's license, to be the person whose name is signed on the preceding document, and acknowledged to me that he signed it voluntarily for its stated purpose as Manager of Hibel Realty, LLC.

_____
Michael J. Norris, Notary Public
My commission expires:  March 23, 2015

MICHAEL J. NORRIS
Notary Public
Commonwealth of Massachusetts
My Commission Expires
March 23, 2012

EXHIBIT "A"

337-345 MAIN STREET, HYANNIS, MA 02601

The land together with buildings thereon located in Barnstable County, Town of Barnstable (Hyannis), Massachusetts, described as follows:

**PARCEL 1**: Unregistered

| | |
|---|---|
| On the NORTH | by Main Street, sixty and 62/100 (60.62) feet; |
| On the EAST | by Ocean Street, one hundred thirty-three and 29/100 (133.29) feet; |
| On the SOUTH | by land now or formerly of William T. Murphy, later of First National Stores, Inc., registered in Land Court Case No. 15853, fifty-eight and 18/100 (58.18) feet;  and |
| On the WEST | by registered land of Cape Interstate, Inc. (Certificate No. 10545), one hundred thirty-one and 35/100 (131.35) feet. |

**PARCEL 2**: Registered

The entire parcel shown on Land Court Plan 15379-A.

**PARCEL 3**: Registered

Lot 3 and Lot 4 on Land Court Plan 15853-C

The above-described parcels are conveyed subject to and together with the benefit of easements set forth in Barnstable Land Court Division Documents No. 76,307, No. 76,306 and No. 685,310, as well as all other rights, easements, reservations and restrictions of record insofar as the same may be in force and effect.

For title reference see deed of Edna Hibel Plotkin, Theodore Plotkin and William Hibel, Trustees of the Edna Hibel Art Foundation, a 501(c) trust, to Hibel Realty LLC, dated June 14, 2003, and filed with the Barnstable County Registry District of the Land Court as Document No. 931,152, with Certificate of Title No. 169924, and recorded in Book 17307, Page 342.

*Property Address: 337-345 Main Street, Hyannis, Massachusetts*

### HIBEL REALTY, LLC
### VOTE

I, Vincent J. DiMento, hereby certify that at a meeting of the Members of said LLC held at its office at 7 Faneuil Hall Marketplace, 3rd Floor, Boston, Massachusetts, on February 16, 2007, after proper notice, at which a quorum was present and voting, it was moved, seconded and unanimously

**VOTED:**   That the manager of Hibel Realty, LLC, Vincent J. DiMento, is hereby authorized and directed to execute any and all closing documents, including but not limited to Promissory Note, Mortgage and Guaranty; to borrow $3,530,000.00 as a business loan on the property known as 337- 345 Main Street, Hyannis, Barnstable County, Massachusetts.

Upon motion duly made and seconded, it was unanimously

**VOTED:**   To authorize and direct Vincent J. DiMento, as Manager of Hibel Realty, LLC, to fully and promptly perform its duties and obligations referred to in said Note, Mortgage and Guaranty, etc. given to LBM Financial, LLC, for a business loan on said property.

I further certify that Vincent J. DiMento is presently the Manger of the LLC.

I further certify that the above vote has not been altered, amended, rescinded or repealed.

DATED at Boston, Massachusetts, this 16th day of February, 2007.

A true record,
Attest:

_____, Manager
Vincent J. DiMento, Manager

PLEASE RECORD AND RETURN TO:
Michael J. Norris, Esq.
171 Locke Drive, Suite 101
Marlborough, MA  01752

Bk 21804   Pg 296 #1129





**William Francis Galvin**
**Secretary of the**
**Commonwealth**

*The Commonwealth of Massachusetts*

*Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

**January 18, 2007**

TO WHOM IT MAY CONCERN:

I hereby certify that a certificate of organization of a Limited Liability Company was filed in this office by

**HIBEL REALTY LLC**

in accordance with the provisions of Massachusetts General Laws Chapter 156C on **July 17, 2003.**

I further certify that said Limited Liability Company has filed all annual reports due and paid all fees with respect to such reports; that said Limited Liability Company has not filed a certificate of cancellation or withdrawal; and that, said Limited Liability Company is in good standing with this office.

I also certify that the names of all managers listed in the most recent filing are: **VINCENT J. DIMENTO**

I further certify, the names of all persons authorized to execute documents filed with this office and listed in the most recent filing are: **VINCENT J. DIMENTO**

The names of all persons authorized to act with respect to real property listed in the most recent filing are: **VINCENT J. DIMENTO**



In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

**Secretary of the Commonwealth**

Processed By:jb

*Return to:*  Michael J. Norris, Esquire
171 Locke Drive, Suite 101
Marlborough, MA 01752



BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST

JOHN F. MEADE, REGISTER

BARNSTABLE REGISTRY OF DEEDS

# Exhibit 3

## RIGHTS TO UNVESTED FUTURE MEMBERSHIP INTEREST
## PLEDGE AGREEMENT

FOR VALUABLE CONSIDERATION, the undersigned, Bernard J. Laverty, Jr. ("Pledgor") hereby pledges and delivers to LBM Financial, LLC, ("Pledgee"), as security for the Obligations (as hereinafter defined) to Pledgee, the following described unvested future rights to equity interests presently owned by Vincent J. DiMento in Hibel Realty, LLC, a Massachusetts limited liability company (the "Company"):

The unvested future right to obtain up to forty percent (40%) of the membership interest of the Company standing in the name of Vincent J. DiMento pursuant and subject to the terms of a certain Memorandum of Agreement, dated January 20, 2006 and attached hereto as Exhibit "A" (the "Collateral").

The term "Obligations" as used herein shall mean (i) the Note in the amount of $3,530,000.00 from the Company to the Pledgee; and (ii) the Guaranty of the Pledgor to Pledgee; both dated February 16, 2007.

Upon default of any of the Obligations secured hereunder, Pledgee shall have all of the rights and remedies of a secured party afforded by the Uniform Commercial Code as now in effect in Massachusetts.

Prior to default hereunder or under any agreement, instrument or document evidencing or securing the Obligations, upon vesting of the membership interests, the Pledgor shall have the right to vote the interests of the Company pledged hereunder, but subject to the following: The Pledgor agrees not to vote or direct Vincent J. DiMento to vote any unvested future or vested membership interests pledged pursuant hereto for the issuance of any further interests of the Company or for the admittance of any additional members to the Company which would have the effect of diluting Pledgor's unvested future or vested interest in the Company, without the prior written consent of Pledgee.

The Pledgor hereby gives Pledgee authority following a default under any of the instruments evidencing the Obligations to direct Vincent J. DiMento to transfer said rights to future or vested membership interests to itself or nominee, with full power as a member to vote the interests in any manner permitted to members. This is done with the understanding that the authority to transfer ownership of the membership interests is to be used only in the event of a default under any instrument, agreement, or document evidencing the Obligations. Upon the timely payment of the Obligations the said authority will end.

In the event that any portion or provision of this agreement shall be deemed null and void, or as against public policy, or in violation of law or otherwise unenforceable, then the parties hereto agree that it shall in no way affect any other provisions or portions of this agreement which shall be enforceable to the fullest extent permitted by law.



1

No action shall be taken hereunder by Pledgee with respect to the Collateral except in the event of a default under any of the Obligations continuing uncured.

This instrument is executed under seal as of February 16, 2007

_____
Bernard J. Lavery, Jr.

The undersigned, constituting the sole holder of the membership interests and the holders of all of the remaining rights to unvested future membership interests, hereby consent to the foregoing, providing that Pledgee gives the Company notice of any default and thirty (30) days to cure the same.

EXECUTED as a sealed instrument as of February 14, 2007.

_____
Vincent J. DiMento

_____
Robert M. Bradley

2

## RIGHTS TO UNVESTED FUTURE MEMBERSHIP INTEREST
## PLEDGE AGREEMENT

FOR VALUABLE CONSIDERATION, the undersigned, Robert M. Bradley ("Pledgor") hereby pledges and delivers to LBM Financial, LLC, ("Pledgee"), as security for the Obligations (as hereinafter defined) to Pledgee, the following described unvested future rights to equity interests presently owned by Vincent J. DiMento in Hibel Realty, LLC, a Massachusetts limited liability company (the "Company"):

The unvested future right to obtain up to forty percent (40%) of the membership interest of the Company standing in the name of Vincent J. DiMento pursuant and subject to the terms of a certain Memorandum of Agreement, dated January 20, 2006 and attached hereto as Exhibit "A" (the "Collateral").

The term "Obligations" as used herein shall mean (i) the Note in the amount of $3,530,000.00 from the Company to the Pledgee; and (ii) the Guaranty of the Pledgor to Pledgee; both dated February 16, 2007.

Upon default of any of the Obligations secured hereunder, Pledgee shall have all of the rights and remedies of a secured party afforded by the Uniform Commercial Code as now in effect in Massachusetts.

Prior to default hereunder or under any agreement, instrument or document evidencing or securing the Obligations, upon vesting of the membership interests, the Pledgor shall have the right to vote the interests of the Company pledged hereunder, but subject to the following: The Pledgor agrees not to vote or direct Vincent J. DiMento to vote any unvested future or vested membership interests pledged pursuant hereto for the issuance of any further interests of the Company or for the admittance of any additional members to the Company which would have the effect of diluting Pledgor's unvested future or vested interest in the Company, without the prior written consent of Pledgee.

The Pledgor hereby gives Pledgee authority following a default under any of the instruments evidencing the Obligations to direct Vincent J. DiMento to transfer said rights to future or vested membership interests to itself or nominee, with full power as a member to vote the interests in any manner permitted to members. This is done with the understanding that the authority to transfer ownership of the membership interests is to be used only in the event of a default under any instrument, agreement, or document evidencing the Obligations. Upon the timely payment of the Obligations the said authority will end.

In the event that any portion or provision of this agreement shall be deemed null and void, or as against public policy, or in violation of law or otherwise unenforceable, then the parties hereto agree that it shall in no way affect any other provisions or portions of this agreement which shall be enforceable to the fullest extent permitted by law.

1



No action shall be taken hereunder by Pledgee with respect to the Collateral except in the event of a default under any of the Obligations continuing uncured.

This instrument is executed under seal as of February 16, 2007

_____
Robert M. Bradley

The undersigned, constituting the sole holder of the membership interests and the holders of all of the remaining rights to unvested future membership interests, hereby consent to the foregoing, providing that Pledgee gives the Company notice of any default and thirty (30) days to cure the same.

EXECUTED as a sealed instrument as of February 14, 2007.

_____
Vincent J. DiMento

_____
Bernard J. Laverty, Jr.

2

# Exhibit 4

## PLEDGE OF MEMBER INTERESTS

**THIS PLEDGE OF MEMBER INTERESTS** (this "Pledge") is made this **16th day of February, 2007,** from **Vincent J. DiMento,** with an address of **7 Faneuil Hill Marketplace, 3rd Floor, Boston, Massachusetts 02109,** (the "Pledgor"), to LBM Financial, LLC, a Massachusetts limited liability company, having a principal place of business and mailing address of 171 Locke Drive, Marlborough, Massachusetts 01752 (the "Pledgee").

### RECITALS

**WHEREAS,** the Pledgor is the owner of **One Hundred (100%) percent** of the member interests in **Hibel Realty, LLC,** a Massachusetts limited liability company (the "Company"), which represents **One Hundred (100%) percent** of the issued and outstanding member interests of the Company (the "Interest"); and

**WHEREAS,** the Pledgee has loaned to **Hibel Realty, LLC,** the amount of **Three Million Five Hundred Thirty and 00/100 ($3,530,000.00) Dollars** (the "Loan"), as evidenced by a Promissory Note dated **February 16, 2007,** from **Hibel Realty, LLC,** to the Pledgee (the "Note"), which Note is secured by this Pledge and other loan documents executed in connection with the Loan (collectively, the "Loan Documents"); and

**WHEREAS,** the Pledgor desires to pledge the Interest, as well as all rents, income, profits, proceeds and other rights to distributions with respect to the Interest (collectively, the "Pledged Income"), to the Pledgee as security for the guarantor's obligations under the Guaranty;

### AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Pledgor agrees as follows:

1. The Recitals are incorporated herein and the facts therein are represented by the Pledgor to be true and accurate.

2. The Pledgor hereby pledges and grants a security interest to the Pledgee in the Interest and hereby assigns the Interest to the Pledgee as security for the full and faithful performance of all of the Pledgor's obligations under the Guaranty. Contemporaneously with the execution and delivery of this Pledge, the Pledgor is delivering to the Pledgee a UCC-1 Financing Statement evidencing the Pledge to be filed by the Pledgee as security for the full and faithful performance of the Pledgor's obligations set forth herein.

3.  In the event that, during the term of this Pledge, any share, dividend, reclassification, readjustment or other chance is declared or made in the capital structure of the Company, all rents, income, profits and other rights to distributions with respect to all new, substituted and additional interests or other securities, issued by reason of any such change shall be held by the Pledgee under the terms of this Pledge in the same manner as the Interest and Pledged Income originally pledged hereunder.

4.  The Pledgor warrants and represents to the Pledgee that the Pledgor is and shall be the owner of the Interest and the Pledged Income free and clear of all pledges, liens, security interests and other encumbrances of every nature whatsoever (except in favor of the Pledgee) and that the Pledgor has the full right, power and authority to pledge the Interest and Pledged Income as herein provided.

5.  In the event of a default in the performance of any of the terms of this Pledge, the Guaranty or the Loan Documents, the Pledgee shall have the rights and remedies provided under the Uniform Commercial Code in force in the Commonwealth of Massachusetts as of the date of this Pledge and, in connection therewith, the Pledgee may, upon no less than fifteen (15) days' written notice to the Pledgor, sent by certified mail, return receipt requested, with all fees prepaid, sell the Interest and/or the Pledged Income in such manner and for such price as the Pledgee may reasonably determine, subject to applicable law. At a public or private sale, the Pledgee shall be free to purchase all or any part of the Interest and/or Pledged Income. To the extent of available sale proceeds, the Pledgee may retain an amount equal to that owed under the Loan Documents, plus the reasonable expenses of the sale, and shall promptly pay any balance of the sale proceeds, if any, to the Pledgor.

6.  Expenses of enforcing the Pledgee's rights hereunder including, but not limited to, preparation for sale, selling or the like and Pledgee's reasonable attorneys' fees and other expenses, shall be payable by the Pledgor and shall be secured thereby.

7.  All of the agreements, obligations, undertakings, representations and warranties herein made by the Pledgor shall inure to the benefit of the Pledgee and its respective successors and assigns, and shall bind the Pledgor and its respective successors and assigns.

8.  The Pledgor agrees to execute such other instruments as the Pledgee may deem in its sole discretion reasonably necessary or desirable to effectuate the purposes of this Pledge, including, without limitation, UCC financing and continuation statements.

9.  The Pledgor agrees that until this Pledge terminates, it shall not, without the express prior written consent of the Pledgee, transfer, sell or assign the Interest or the Pledged Income or any interest thereon or enter into any agreement for the transfer, sale or assignment of such Interest or Pledged Income, or permit or suffer any other liens on the Interest or the Pledged Income, whether or not junior to the lien created hereby, to be created or to exist with respect to the Interest or the Pledged Income.

10. The Pledgee shall not by any act, delay, omission or otherwise e deemed to have waived any of its rights or remedies hereunder and no waive shall be valid unless in writing, signed by the Pledgee and then only the extent therein set forth. A waiver of any right or remedy hereunder on any one (1) occasion shall not be construed as a bar to any right or remedy that the Pledgee would otherwise had on any future occasion. No failure to exercise nor any delay in exercising, on the part of the Pledgee, any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or future exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights and remedies provided by law.

11. Any provision of this Pledge that is prohibited or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extend of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12. This instrument shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts; provided, however, that if any applicable conflict or choice of law rules would choose the law of another state, the Pledgor waives such rules and agrees that Massachusetts substantive, procedural and constitutional law shall nonetheless govern.

13. The Pledgor hereby consents to the non-exclusive personal jurisdiction of the federal and state courts located in Suffolk County, Massachusetts, in any and all actions between the Pledgor and the Lender arising under or in connection with this Pledge, the Loan or any other of the Loan Documents.

14. *THE PLEDGOR, BEING AN EXPERIENCED PARTICIPANT IN BUSINESS VENTURES, AND HAVING CONSULTED WITH COUNSEL OF THE PLEDGOR'S CHOOSING, HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING; (i) BROUGHT BY THE BORROWER, THE LENDER OR ANY OTHER PERSON RELATING TO: (a) THE LOAN, (b) THIS PLEDGE OR MEMBER INTERESTS, OR (c) ANY OF THE OTHER LOAN DOCUMENTS; OR (ii) TO WHICH THE LENDER IS A PARTY (WHETHER SUCH CASE OR CONTROERSY IS INITIATED BY OR AGAINST THE LENDER OR IN WHICH THE LENDER IS JOINED AS A PARTY LITIGANT). THE PLEDGOR HEREBY AGREES THAT THIS PLEDGE OF MEMBER INTERESTS CONSTITUTES A WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY, AND THE PLEDGOR DOES HEREBY CONSTITUTE AND APPOINT LENDER THE PLEDGOR'S TRUE AND LAWFUL ATTORNEY-IN-FACT, WHICH APPOINTMENT IS COUPLED WITH AN INTEREST, AND THE PLEDGOR DOES HEREBY AUTHORIZE AND EMPOWER TH ELENDER, IN THE NAME, PLACE AND STEAD OF THE PLEDGOR, TO FILE THIS WITH THE CLERK OR JUDGE OF ANY COURT OF COMPETENT JURISDICTION AS A STATUTORY WRITTEN CONSENT TO WAIVER OF TRIAL BY JURY. THE PLEDGOR ACKNOWLEDGES THAT ITS WAIVER OF TRIAL BY JURY HAS BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY THE PLEDGOR, AND ONLY AFTER CONSULTATION WITH SOPHISTICATED LEGAL COUNSEL OF THE PLEDGOR'S OWN CHOOSING, AS PART OF A BARGAINED-FOR LOAN TRANSACTION.*

15. Upon payment in full of the obligations under this Note, this Pledge shall terminate.


This Pledge is executed as a sealed instrument as of the date first written above.

PLEDGOR:

_____

_____
Vincent J. DiMento

The undersigned referred to above as the LLC, hereby assents to the foregoing, providing that Pledgee gives the Company notice of any default and five (5) days to cure the same.

EXECUTED as a sealed instrument as of February 16, 2007.

Hibel Realty, LLC

BY:

Vincent J. DiMento, Manager

5

*EXHIBIT "A"*


*DEBTOR:*   *HIBEL REALTY, LLC*


*SECURED   PARTY:*    *LBM FINANCIAL, LLC*


All of Debtor's right, title and interest in and to One Hundred (100%) percent Member Interest in Hibel, LLC, a Massachusetts limited liability company, including, without limitation, all cash, interest, dividends and other assets hereafter earned, paid, distributed, issued or delivered in respect of or in connection therewith, and all replacements, substitutions for, additions to and renewals and proceeds thereof, whether now existing or hereafter arising.

# Exhibit 5

Commonwealth of Massachusetts

# Commonwealth of Massachusetts
## County of Middlesex
## The Superior Court

### E X E C U T I O N

CIVIL DOCKET# **MICV2008-00633**

**LBM Financial, LLC v Bernard J. Laverty, Jr. et al**

**To the Sheriffs of our Several Counties or their Deputies, GREETING:**

DAMAGES:        $26,861,915.46
COSTS:              $293.10
POST JUD/INT:    $565,215.25
_____
TOTAL:          $27,427,423.81

**WHEREAS LBM Financial, LLC, is a limited liability company with a principal place of business in Marlborough, in the County of Middlesex, in the Commonwealth of Massachusetts** by the consideration of our Justices of our Superior Court at Middlesex, aforesaid, on **the twenty-ninth day of May 2008** recovered Judgment against **Bernard J. Laverty, Jr., is an individual with a last and usual place of residence in Marshfield, in the County of Plymouth, in the said Commonwealth of Massachusetts** for the sum of **Twenty Six Million Eight Hundred Sixty One Thousand Nine Hundred Fifteen Dollars and Forty Six Cents** debt or damages, and **Two Hundred Ninety Three Dollars and Ten Cents** costs of suit, as to us appears of record, where execution remains to be done:

**We command you** therefore, that of the goods, chattels or land of the said judgment debtor(s) within your precinct, you cause to be paid and satisfied unto the said judgment creditor(s), at the value thereof in money, with interest thereon in the sum of **Five Hundred Sixty Five Thousand Two Hundred Fifteen Dollars and Twenty Five Cents** from day of the rendition of said Judgment to date of execution the aforesaid sums, being **$27,427,423.81** in the whole, and thereof also to satisfy yourself for your own fees.

Hereof fail not, and make return of this writ with your doing thereon into the Clerk's office of said Court at Woburn, within our County of Middlesex, and to make return of this writ within twenty years after the date of the said judgment, or within ten days after this writ has been satisfied or discharged.

**Witness, Barbara J. Rouse**, Esquire, Chief Justice of the Superior Court, at Woburn, Massachusetts this 1st day of August, 2008.

RETURN TO:
**Meegan B Casey**
**Reimer & Braunstein LLP**
**3 Center Plaza**
**Boston, MA 02108**

..........*Mary S. Stewart*..........
Deputy Assistant Clerk